UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:24CR87(JAM) |
| | : | |
| v. | : | |
| | : | |
| LUIS PADILLA | : | September 5, 2024 |

GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in connection with defendant Luis Padilla's ("Padilla" or "defendant") sentencing, which is currently scheduled for September 13, 2024 at 2:00 p.m.

I. **Factual background**

A. The Escape

On February 27, 2018, the Honorable U.S. District Court Judge Vanessa L. Bryant, District of Connecticut, sentenced Mr. Padilla to seventy-eight months' imprisonment to be followed by five years of supervised release on his conviction for Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C). *See* United States v. Luis Padilla, 3:16cr205(VLB)-2.

On or about March 17, 2021, the Bureau of Prisons transferred Mr. Padilla from FCI Hazelton, in West Virginia, to the Drapelick Center RRC in Bloomfield, Connecticut to serve the remainder of his custodial sentence and to allow Mr. Padilla to transition back to the community. On his arrival at Drapelick Center RRC, staff informed Mr. Padilla that he was lawfully required to abide by the terms and conditions imposed by that facility, including the continuing obligation

to return as required for purposes of curfew or from any period of liberty period granted by a pass or other leave-authorization.

On May 9, 2022, Mr. Padilla was released from the Drapelick Center RRC to home confinement at his mother's residence in Waterbury, Connecticut. On May 30, 2022, after Mr. Padilla left his home without authorization for approximately an hour at night, his home confinement was revoked and he was returned to the Drapelick Center RRC.

According to Mr. Padilla's sentencing memorandum, on his return to the Drapelick Center RRC, he was told that the Bureau of Prisons was recommending that he be remanded to serve the remainder of his prison term, which would run through early September 2024. Doc. 46 at 2. On June 1, 2022, before any decision on transfer could be made or implemented, RRC staff determined that Mr. Padilla had walked out of the RRC without authorization at 3:01 a.m. Mr. Padilla did not ever return.

The United States Marshals Service began efforts to try to locate Mr. Padilla. On August 22, 2022, the Honorable S. Dave Vatti, United States Magistrate Judge, authorized an arrest warrant, based on a criminal complaint charging Escape, in violation of 18 U.S.C. § 751. Information the Marshals Service garnered from law enforcement sources was that Mr. Padilla was in Maine.

B. The Arrest

On April 5, 2024, around 11:10 pm, Bangor Police Officer Kaeden Beswick responded to the report of a family fight at a park in Bangor. A witness told the officer that a man and a woman were arguing in the park and had grabbed each other while yelling. Officer Beswick saw Courtney Prendergast in the driver's seat of a 2015 Mercedes C-Class sedan bearing Maine license

plates. After speaking briefly to Prendergast, Officer Beswick spoke to the passenger, who identified himself as "Luis Pena." Officer Beswick inquired further of the passenger, who related that his social security number was 11X-XX-0252. Another responding officer ran the provided social security number and noticed that it was one digit off from the social security number of a fugitive named Luis Padilla. Based on the arrest warrant issued by Judge Vatti, Mr. Padilla was arrested. When arrested, Mr. Padilla told Bangor police officers that his address was 37 Hemlock Point Road, in Princeton, Maine, which according to an AUSA in the District of Maine, Joel Casey, is on the Passamaquoddy Reservation in the northern most part of Maine, in an area federal and state law enforcement rarely traverse.

## II.    Procedural history

On April 16, 2024, a Grand Jury sitting in Bridgeport, Connecticut, returned an indictment charging Mr. Padilla with Escape, in violation of Title 18, United States Code, Section 751. On June 10, 2024, Mr. Padilla pleaded guilty to the single count in the indictment.

## III.   The Presentence Report

On August 26, 2024, the Probation Department issued a Presentence Report ("PSR") that found the defendant's applicable base offense level, under Chapter Two of the Sentencing Guidelines, to be a level 13. PSR ¶ 17. Subtracting four levels because Mr. Padilla escaped from a non-secure facility, pursuant to U.S.S.G. § 2P1.1(b)(3), and a further two levels under U.S.S.G. § 3E1.1(a), for acceptance of responsibility, yielded a total offense level of 7. PSR ¶¶ 18-25. Finally, the PSR concluded that the defendant fell within Criminal History Category V. PSR ¶ 40. As a result, the PSR concluded that the defendant faces a Guideline sentencing range of 12 to 18 months' imprisonment. PSR ¶ 78.

<u>Argument</u>

I. **LEGAL FRAMEWORK**

Following the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-45 (2005), which rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). The § 3553(a) factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a).

The Second Circuit reviews a sentence for reasonableness. *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005). The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *Id*.

## II. DISCUSSION

For the reasons discussed below, the Government respectfully requests that Mr. Padilla be committed back to the Bureau of Prisons for a time period that falls within the advisory Guidelines. Such a sentence will be minimally necessary to achieve the purposes of federal sentencing.

### A. The Nature and Seriousness of the Offense

Mr. Padilla was sentenced to a term of 78 months of imprisonment to be followed by five years of supervised release. When transitioned from a BOP FCI to a halfway house and then to his mother's home to help *him* in transitioning back into society, Mr. Padilla determined that rules did not apply to him and defied curfew regulations. Then, after being returned to the halfway house for his infraction, he feared that he might have to serve the three months remaining on his sentence in a BOP facility. Ignoring that his breach of trust was the cause of the stiffer scrutiny, Mr. Padilla determined to leave the halfway house and fled to the northern-most part of Maine to a Native American reservation, which has its own police force and through which federal and state authorities rarely pass. There, he lived a life of freedom, choosing to do what he wanted, even if he is to be believed, that choice was "relapsing on alcohol and drugs," *see* Doc. 46 at 6, a self-serving claim that the Government seriously questions, as detailed below.

What is notable is that Mr. Padilla escape avoided not only the three months of incarceration that he *might* have faced for his infraction, but also the five years of supervision from probation office that Judge Bryant's sentence had mandated. In doing so, he determined that he did not need to follow the order of a District Court judge; Judge Bryant's sentence, to Mr. Padilla, was merely advisory, and once cell bars no longer restrained him, he could do as and live where he wished. When living with his mother proved too onerous, he could break curfew. When

5

punished for his infraction, he could simply leave and return to his drug selling location.

Nor was Mr. Padilla's decision to flee Connecticut a mere whim, driven by a drunken or drug-induced stupor. To the contrary, the location to which Mr. Padilla fled shows that Mr. Padilla intended never to be caught. He fled to northern Maine, to the same Native American reservation where he had previously sold drugs and from where he had recruited his previous co-conspirator Cecil Stanley. *See* 3:16cr205(VLB). Indeed, when arrested, he provided an address on the Passamaquoddy Reservation to Bangor Police and not the Waterbury address he later claimed to Probation (see below). That Mr. Padilla chose to hide in a location that he knew well, which had its own law enforcement personnel and courts separate from federal and state, and which housed his old drug customers ensured that he was practically living in another country unlikely to be returned to jail or to face supervision. Unfortunately for Mr. Padilla, he chose Bangor, Maine as the location to fight with his girlfriend.

While Mr. Padilla was free of any constraints on the Passamaquoddy Reservation, the United State Marshal's Service both in Connecticut and in Maine wasted valuable time and resources searching for Mr. Padilla. A Magistrate Judge in Connecticut issued a federal arrest warrant for him. To argue that he has been punished enough, as Mr. Padilla now does, ignores the huge benefit Mr. Padilla received from ignoring a court order for two years and the resources his escape has wasted.

### B.     History and Characteristics

Mr. Padilla has a history of self-centered anti-social behavior that is displayed, to be sure, in his lengthy criminal history. Mr. Padilla claim to Probation and this Court that he escaped from a halfway house because he "relapsed" into drug and alcohol abuse "triggered by the anniversary

of his brother's murder" in 2005 is somewhat surprising. To be sure, in his PSR interview in 2017 Mr. Padilla acknowledged that his brother's death has "been hard on me, especially my brother," and was especially hard around the May 27th anniversary of his twin brother's unfortunate passing. However, Mr. Padilla told Probation at that time, "I try not to dwell on it." 3:16cr205, Doc. 149 at ¶61. Surely if Mr. Padilla's trauma brought on by the anniversary of his brother's death had propelled him to escape, once that trauma subsided and he no longer "dwell[ed] on it," he could have returned to Drapelick or turned himself in to law enforcement.

Moreover, his claim of substance abuse while on escape status must be viewed with suspicion. His sister he claims to have lived with while on escape status (see below) told Probation this year that she has no "knowledge of Mr. Padilla's substance abuse history." PSR ¶ 54. In fact, when Mr. Padilla was arrested, he was neither intoxicated nor high; nor were any drugs or alcohol found on him or in the car in which he was a passenger. Further scrutiny of his prior PSR shows Mr. Padilla's disdain for drug use; he explained to Probation Officer Chester that he had to "br[ea]k[] up" with his paramour due to her "drug use and infidelity." 3:16cr205(VLB), Doc. 149, at ¶ 53. At the risk of sounding crass, the logical connection between Mr. Padilla's avowed drug and alcohol use and his escape appears particularly tenuous.

Perhaps Mr. Padilla's narrative about fleeing Drapelick on June 1 because of the seventeenth anniversary of his brother's death would be more credible if he did not lie in other instances. Notably, when arrested, he lied to law enforcement about his name and social security number. A further lie can be found in a letter to this Court, accompanying his request for a sentencing to the Salvation Army. In that letter, he claims "I have never had the benefit of participating in any effective substance use treatments or programs. Doc. 46 at 17 & Def. Exh.

7

A. Yet the PSR in this case in paragraph 64 notes that: (1) Mr. Padilla "completed an outpatient treatment program . . . in New York, New York when he was 17 years old;" (2) he later entered "Phoenix House, a long-term residential program in New York . . . designed to last 18-24 months, but . . . left after 90 days"; and (3) he was determined not to be in need of treatment in 2016, shortly before his federal arrest.  Even if those prior treatments could be viewed as "failures" because they were long ago, the PSR's investigation reveals that Mr. Padilla "successfully completed the BOP's Drug Education program" prior to his transition to Drapelick RRC.  *Id.*  Put simply, Mr. Padilla's blanket statement to the Court that he has "never had the benefit of participating in any effective substance use treatments or programs" is palpably false.  Indeed, that Mr. Padilla chose to leave the Phoenix Program after 90 days does not demonstrate an absence of access to an "effective substance use treatment" but rather a pattern of leaving and fleeing any programming that might constrain his liberty.  To argue that he should now, after having escaped for two years, be placed in the Salvation Army Program because he needs treatment and will surely follow through is simply a request for the chance to again escape to the safety of the Passamaquoddy Reservation.

Another lie Mr. Padilla has told Probation can be found in his claim during the PSR interview to have "lived with his sister in Connecticut while on escape status." PSR ¶ 55. Probation's interview of the sister, however, shattered that declaration; his sister told Probation that "Mr. Padilla's whereabout[s] were unknown to her while he was on escape status." PSR ¶ 52.  And, as noted above, when arrested in Maine, he did not provide his sister's address but an address on the Passamaquoddy Reservation in Maine.  Obviously noting the falsity of Mr. Padilla's statement to Probation, counsel has tried to correct it by stating that Mr. Padilla lived in

8

Connecticut, New York and Maine and somehow secretly lived in the 27 Platt Street address in a separate residence of which (although it is unsaid) his sister must not have known.    But counsel cannot undo Mr. Padilla's outright lie to Probation.

Similarly, the PSR notes that Mr. Padilla refused to "provide any information regarding past or present relationships," PSR ¶ 55, leaving it to counsel to attempt to mitigate the refusal to answer Probation by advising that "Mr. Padilla is currently in a relationship with Courtney Prendergast," the woman he was in an argument with when arrested in Bangor.  Mr. Padilla's refusal to provide PSR with any contact or reference about past or present relationships, of course, made it impossible for Probation to verify claims Mr. Padilla made about his whereabouts while on escape or his alcohol and drug use.   In any event, Mr. Padilla's proven lies to law enforcement on arrest, to Probation in the PSR interview and to this Court in his letter describing how he has changed make it difficult to believe anything Mr. Padilla says, let alone his claim that he spent his two years of escape freedom in the throes of drugs and alcohol abuse brought on by the anniversary of his brother's death.   Even if there was a logical connection between drug and alcohol abuse and a two-year escape, Mr. Padilla's continued lies do not support a "downward departure or variance," Doc. 46 at 16, as Mr. Padilla requests.

      C.      **Promote Respect for the Law and Provide Just Punishment**

Mr. Padilla escaped not only three months of incarceration but five years of supervised release.   While a number of returning adults seek to have their terms of supervised release reduced, they do so through their positive response to their probation officer's guidance.   Mr. Padilla, a veteran of the criminal justice system, no doubt knew that escaping might get him more prison time, but he also very likely knew that his escape would have no impact on any

supervised release he has to serve. Whether he escaped or not, if caught, he would serve five years of supervised release and no more. Mr. Padilla needs to learn to respect the law; he is not a neophyte to the criminal justice system who merits leniency. The Government does not disagree that Mr. Padilla should participate in and complete the Salvation Army Program, but his participation in that program should come after he has served a sentence of a term between 12 and 18 months, and be part of his supervised release conditions.

### D. Need to Accomplish Specific and General Deterrence

Mr. Padilla, as discussed above, has a history of defying court orders regarding treatment. He fled the Phoenix Program after 90 days. He left Drapelick as soon as he determined that he might be returned to prison. In his letter to the Court, he notes that he was not allowed to undertake RDAP, claiming "he never sought an alternative," and he blames Drapelick RRC for failing to give him treatment for his recidivism. In so laying blame, he conveniently omits that he "successfully completed the BOP's Drug Education program" prior to his transition to Drapelick RRC. PSR ¶ 64. Placing Mr. Padilla in an "extended residency at the Salvation Army" will not "make Mr. Padilla less likely to recidivate," *id.*, it will encourage him to do exactly what he has consistently done when faced with constraint without bars – to run.

In his previous PSR interview, when asked by Probation Officer Chester what "the Court could look to as a sign that he has turned a corner and will not continue to make the same mistakes that have plagued him thus far, Mr. Padilla stated he is 'older and more mature,' and that his commitment to his family and nephew will help motivate him." 3:16cr205(VLB), Doc. 149, at ¶ 62. Five years after that interview, while at Drapelick RRC, Mr. Padilla has gotten older, but not more mature. On escaping, he did not live with his family, though he lied about living with

his sister, or care for his nephew – he fled to Maine. Mr. Padilla has to learn that court orders must be followed and are not discretionary.

## III.     CONCLUSION

For the foregoing reasons, the Government respectfully asks the Court to impose a sentence within the advisory Guidelines range.

>                    Respectfully submitted,
>
>                    VANESSA ROBERTS AVERY
>                    UNITED STATES ATTORNEY
>
>                    /s/
>
>                    RAHUL KALE
>                    ASSISTANT UNITED STATES ATTORNEY
>                    Federal Bar No. phv02526
>                    United States Attorney's Office
>                    1000 Lafayette Blvd., 10th Floor
>                    Bridgeport, CT 06604
>                    (203) 696-3029

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 6, 2024, a copy of the foregoing was filed electronically, and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

/s/
_____
RAHUL KALE
ASSISTANT U.S. ATTORNEY